IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80343-3-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| KEVIN PATRICK TAYLOR, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — Kevin P. Taylor was convicted of arson in the second degree and murder in the second degree-felony murder following a jury trial. Taylor had a history of disorienting seizures, which was the basis for his diminished capacity defense. At trial, the primary issue was whether Taylor was able to form the necessary mental states of the various charges such that he could be found criminally culpable. During trial, the State's expert violated multiple pretrial rulings by the court which led to an unsuccessful motion for mistrial by the defense. Taylor appeals, arguing the court erred in denying his for-cause challenge to a juror and his motion for mistrial, and by failing to include the mental state of recklessness in the jury instruction on diminished capacity. The trial judge's ruling on the juror challenge was proper, but the court erred in denying the defense motion for mistrial and in the omission of one of the mental states from the diminished capacity instruction. Accordingly, we reverse.

FACTS

Kevin Taylor was convicted of murder in the second degree-felony murder and arson in the second degree following a jury trial. The State alleged that on September 3, 2016, Taylor killed his wife, Julie[1], by striking her repeatedly with a .22 caliber rifle and then set fire to her Jeep. At trial, the State presented charges of murder in the second degree-intentional murder and murder in the second degree-felony murder (based on an allegation of assault in the second degree), in addition to one count of arson in the second degree for the fire in the Jeep. Taylor pursued a diminished capacity defense based on a delusional psychotic state brought on by his documented seizure disorder. Both the defense and the State presented expert testimony addressing the central question of whether Taylor's condition impacted his capacity to form the various required mental states for the charged crimes.

Taylor was diagnosed with a seizure disorder in 2005. In 2013, he had a seizure while driving which led to his hospitalization. Following this accident, his seizures appeared to be better controlled, though he did still experience them periodically. When Taylor had a seizure, he would become disoriented and often unaware of where he was or who he was with. Nonetheless, Taylor could still walk, talk, and navigate around objects during an episode.

Leading up to the night of the killing, Taylor's seizures were increasing in frequency. Julie texted the following messages to a friend just four days prior to

---

[1] Because Kevin and Julie Taylor share the same last name, we will refer to Julie by her first name for clarity. No disrespect is intended.

her death: "So Kevin has had four seizures since 12:15 this morning . . . He's scaring the shit out of me. . . . Last one was just after 7:00." Julie recorded Taylor during one of his seizures on August 31, 2016. In the video, he was talking about recycling, laughing one minute and crying in the next. His son, Jake, testified that this was not his father's typical behavior during a seizure. Julie took Taylor to see his primary care provider, Dr. John Gossom, the following day. Gossom testified that Julie conveyed concern over Taylor's spells of rage and anger which she believed were brought on by his seizures. Gossom increased the dosage of Taylor's seizure medication and indicated further recording of the seizures could be helpful.

Julie happened to record Taylor moments before her death. The video, dated September 3, 2016, lasts three minutes and 27 seconds and shows Taylor in a very strange state. That same night, two calls were made from the Taylor residence to 911 at 1:00 a.m. and 1:13 a.m. Each call was an "open line" with music playing in the background.

San Juan County Sheriff's Deputy Eric Gardiner was first on the scene at 1:19 a.m. Upon arrival, Gardiner heard music and went toward the side deck of the Taylors' home to investigate. The sliding door was open and Julie was on the ground with her feet toward the door. There was blood splatter around her body and Gardiner observed a broken rifle stock and broken ceramic pot nearby. A motorcycle helmet was partially covering Julie's head and there were seven cans of cat food tucked in her arm and on her hand.

Gardiner noticed Taylor reclined on the couch, looking at Gardiner with a blank stare. Taylor then said, "I got her." Gardiner put Taylor in the back of his patrol car. While placing him in the backseat, Taylor said Julie had poisoned him. When Gardiner asked if he had any symptoms, Taylor said no. Gardiner quickly surveyed the area and then returned to his vehicle, at which point Taylor told Gardiner to check Julie's Jeep and said something about a fire. Gardiner checked the Jeep and found the interior was smoking. There was a dumbbell and a propane torch on the ground near the Jeep.

Sergeant Scott Brennan arrived on the scene around 1:30 a.m. and paramedic Kyle Davies arrived minutes later. Davies examined Taylor in the back of the patrol car. Davies asked if Taylor had been drinking and Taylor replied that he had one drink before dinner and two mixed drinks while watching television. Davies administered the Glasgow Coma Scale and the results suggested that Taylor was alert. Davies later testified that Taylor was oriented to time and place during their interaction at the scene. However, Taylor did say numerous times he had been poisoned by his wife and that he wanted a divorce.

Gardiner took Taylor to the hospital at around two in the morning. When Gardiner told Taylor where they were going, Taylor said "I really screwed up." When Gardiner asked Taylor to repeat himself, he said, "She really screwed up." Gardiner testified that when Taylor was asked by hospital staff why he thought he was poisoned, Taylor responded, "Julie told him that he had less than a minute to live, and said he guessed he decided to take her with him." An hour or so later, while lying in the hospital bed, Taylor asked Gardiner, "Where's Julie?" Taylor

- 4 -

looked confused and asked what happened. Gardiner told him he did not know, to which Taylor responded, "You drove me in." Later that morning, Taylor was booked into jail. Back at the house, deputies located a series of strange notes on the counter and a Kindle Fire tablet that contained videos from August 31st and September 3rd.

Dr. Andres Kanner, a neurologist and medical school professor specializing in epilepsy, testified at trial as an expert for the defense. Kanner opined that, based on all of the evidence, Taylor did not have the capacity to form the intent to either kill or assault his wife or to knowingly and maliciously set fire to her Jeep. Kanner explained in great detail how seizures of this sort can manifest in an individual. Kanner concluded that Taylor was suffering from postictal psychosis; a form of psychosis that occurs after a flurry of seizures and causes the individual to become irritable, withdrawn, or isolated, which can later lead to "overt psychotic symptoms." He further indicated that the paramedic's evaluation by way of the Glasgow Coma Scale had little relevance to the more nuanced analysis of cognitive function regarding capacity.[2]

Kanner also ruled out toxicity from drugs or alcohol as the cause of his behavior. A blood sample was taken from Taylor at the hospital and a toxicology screening conducted. The results showed a blood alcohol content (BAC) of .10g/100mL. However, the doctor who administered the blood draw testified Taylor was not significantly impaired in a clinical sense. Kanner testified that .10

---

[2] Specifically, Kanner explained that the utility of the Glasgow Coma Scale is limited to determining alertness or consciousness of the subject. The fact that Taylor was conscious when contacted by first responders at the scene was not in dispute.

BAC was not sufficient to cause a psychotic episode and concluded that the alcohol had no impact on Taylor's behavior.

Dr. Jenna Tomei, a psychologist at Western State Hospital, was called as an expert witness for the State. She violated numerous pretrial rulings during her testimony. Tomei opined that Taylor had the capacity to form the requisite mental states for the charged offenses: intent, knowledge, and malice. Though she agreed with much of Kanner's testimony regarding the science related to the seizure disorder and postictal psychosis, she disagreed as to the ultimate conclusion on capacity. When asked by the prosecutor what information she had reviewed as part of her evaluation, Tomei responded, "In this specific case, I reviewed prior medical records for Mr. Taylor. I also reviewed prior legal documents regarding his criminal history and any—." The reference to criminal history violated the court's ruling on a defense motion in limine; the court sustained the resulting defense objection and granted its motion to strike.

Later, the prosecution asked how Taylor's BAC may have impacted Tomei's opinion and she responded "Even though it appears that Mr. Taylor does have a lengthy history of—." The defense again objected and moved to strike; the court sustained the objection and granted the motion to strike. The court then ruled that Tomei could not testify regarding possibilities and conjecture as to how substance use may have contributed to Taylor's behavior. Following this ruling, Tomei testified that she found nothing unusual about Taylor's behavior toward responding officers, as she explained, "He replied very appropriately to the officer saying, I'm not going to be any trouble, asking for his attorney—." The prosecutor then

interjected: "I'm going to stop you right there." Following this exchange, defense requested a sidebar and the jury was excused.

The defense moved for a mistrial, noting this was the third time Tomei had violated the court's rulings on motions in limine. Taylor asserted that either Tomei had not been informed of the rulings or she was purposefully disregarding them. During voir dire on that issue, it became apparent that, despite the State's initial broad assertion that it had advised Tomei of the evidentiary rulings, the prosecutor had failed to instruct her that the court had specifically excluded references to Taylor's criminal history or request for an attorney. The court ruled that though the violations occurred and were improper, the cumulative prejudice was not so great that nothing short of a new trial would ensure fair proceedings. Taylor's motion was denied.

The jury convicted Taylor of murder in the second degree–felony murder and arson in the second degree. The jury found several aggravators by way of special verdict, including the fact that Taylor was armed with a firearm at the time of the murder. He was acquitted of murder in the second degree–intentional murder. Taylor was sentenced to 240 months in prison, which included 60 months based on the firearm enhancement, followed by 36 months of community custody. Taylor now appeals.

ANALYSIS

I.     Denial of Defense Challenge to Juror 3 for Cause

Taylor first assigns error to the trial court's denial of his for-cause challenge to juror 3 during voir dire.[3]  In response to questioning, juror 3 explained that he was familiar with a witness the State expected to call in its case in chief as they sometimes worked together when the juror was engaged as a volunteer with San Juan EMS.[4]  Juror 3 went on to admit that his familiarity with the witness might lead him to give the witness a bit more credibility than someone else.  However, juror 3 also expressly indicated that he could put his own training and experience aside and give the expert opinions more weight than his knowledge.  He further declared that he would "trust the facts."

As a preliminary matter, the State argues Taylor's assignment of error on this issue is waived since he did not use a peremptory challenge on juror 3 following the denial of his for-cause challenge.  Taylor ultimately did exhaust all of his peremptory challenges on other potential jurors.  This argument misunderstands the distinctions between preservation and prejudice in the context of for-cause and peremptory challenges.  The issue is not waived.  See State v. David, 118 Wn. App. 61, 68–69, 74 P.3d 686 (2003).

The federal and state constitutions both guarantee trial by an impartial jury in all criminal prosecutions.  U.S. CONST. amend. VI, XIV; WASH. CONST. art. I, §§ 3, 21, 22; State v. Davis, 141 Wn.2d 798, 824, 10 P.3d 977 (2000).  "This right is

---

[3] During voir dire, this juror was identified as 27, but this was changed to juror 3 once he was seated. The parties' briefing refers to him as juror 3 and we adopt that identifier.

[4] San Juan Emergency Medical Service.

violated by the inclusion on the jury of a biased juror, whether the bias is actual or implied." In re Pers. Restraint Petition of Yates, 177 Wn.2d 1, 30, 296 P.3d 872 (2013). "The decision to grant or deny a particular challenge for cause is a matter addressed to the discretion of the trial judge." State v. Wilson, 141 Wn. App. 597, 606, 171 P.3d 501 (2007). A juror's relationship to a witness in the case does not necessarily disqualify a juror. Id.

In Wilson, a prospective juror had previously been employed at one of the retail locations, Rite-Aid, alleged to have suffered a loss in the theft at issue in the trial. Id. at 607–08. She also disclosed that she was familiar with one of the State's witnesses as they had been co-workers when she was employed at Rite-Aid. Id. The trial court denied a for-cause challenge as the juror had indicated her previous employment would not cause her any bias. Id. at 608. Our court determined that the denial of the for-cause challenge was not an abuse its discretion. Id. This case provides that even a relationship with a victim may not result in bias that would require disqualification of the juror.

Here, Taylor takes issue with the fact that juror 3 sometimes worked with a witness for the State, Davies, as a volunteer with San Juan EMS. The juror stated he worked with Davies at least once a month and that he had a good working relationship with him. Taylor focuses on juror 3's statement that he would trust Davies' opinion over someone else if it was related to Davies' field. He also indicated that if another individual testified differently than Davies, he might give Davies' opinion greater weight. However, the juror also expressed that he would need to know the facts and "would trust the facts." There was quite a bit of

examination of this juror based on his field and varying levels of familiarity with a number of the State's witnesses. When viewed as a whole, juror 3's statements ultimately indicate his willingness and ability to be impartial generally. Juror 3 also expressly indicated that he would give more weight to the opinions of experts in a particular field than to his own knowledge and training. The trial court did not abuse its discretion in determining that juror 3 could carry out his duties in an impartial manner and denying the for-cause challenge.

II.     Denial of Defense Motion for Mistrial Based on Cumulative Effect

Though Taylor's briefing frames this challenge by separating out some of the various violations of motions in limine as distinct issues, the trial court considered a single motion for mistrial by the defense when Taylor expressly argued that the cumulative effect of the numerous violations was of "constitutional magnitude." On appeal, we are tasked with reviewing the various rulings of the trial court, which necessarily requires that we consider the record before the court at the time the motion was made and the objections and arguments of the parties as they were framed for the trial judge. As such, our review here follows the manner by which the issue was presented to the trial court. See State v. Stoddard, 192 Wn. App. 222, 226–27, 366 P.3d 474 (2016).

We review a trial court's denial of a motion for mistrial for an abuse of discretion. State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). "A court abuses its discretion when it applies the wrong legal standard or bases its decision on an erroneous application of the law." State v. Cox, _Wn. App. 2d _, 484 P.3d 529 (2021). The Supreme Court of our state has indicated a trial court should only

grant a mistrial when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be tried fairly. State v. Rodriguez, 146 Wn.2d 260, 270, 45 P.3d 541 (2002). We consider any prejudice from error against the backdrop of the trial as a whole. State v. Escalona, 49 Wn. App. 251, 254, 742 P.2d 190 (1987).

We utilize a three-part test in determining whether the petitioner was so prejudiced as to require a new trial. State v. Weber, 99 Wn.2d 158, 165–66, 659 P.2d 1102 (1983). We consider 1) the seriousness of the irregularity, 2) whether the statement at issue was cumulative of other properly admitted evidence, and 3) whether the irregularity was able to be cured by an instruction to disregard the improper testimony, which the jury is presumed to follow. Id.

Here, Taylor brought a motion for mistrial outside of the presence of the jury immediately after Tomei stated the following during her testimony: "[Taylor] replied very appropriately to the officer saying, I'm not going to be any trouble, asking for his attorney—." At that point, the prosecutor interjected, "I'm going to stop you right there." Taylor's attorney then asked for a sidebar where the motion was taken up. The motion for mistrial addressed all three violations of pretrial orders by Tomei up to that point: the reference to Taylor asking for his attorney, noting that she had reviewed his criminal history in preparing her report, and her statement about his "lengthy history of" substance use. Taylor's counsel asserted that either Tomei had not been informed of the pretrial rulings or she was intentionally defying them. The prosecutor responded by assuring the court, "she has been instructed." The defense argued that not only was the comment regarding Taylor's request for

- 11 -

an attorney of constitutional magnitude, but so was "the cumulative effect of [the] witness's disregard for the Court's order three times now."

The prosecutor indicated that they had purposefully talked over Tomei when she began to discuss Taylor asking for an attorney. While the State had affirmatively represented that Tomei had been informed of the pretrial rulings, the prosecutor conceded that she may have had a "slip of the tongue." The court then took time to locate relevant authority prior to its consideration of the motion. When the case was recalled after the recess, the parties engaged in further argument which led to the defense conducting limited voir dire of Tomei regarding her instruction from the State as to pretrial rulings. Tomei indicated that, prior to taking the stand, she was instructed not to reference substance use. She admitted she was not informed about limitations on statements about criminal history until after the defense objection to that portion of her testimony. Tomei also indicated that she had not been informed that she could not reference Taylor's request for counsel.

When the court ruled on the motion, it found that Tomei had not purposefully violated the order and that her statement regarding Taylor's request for his attorney, though improper, was responsive to the question asked. The court expressly found that the prejudicial effect of that comment was "minimal" as she was immediately interrupted by the prosecutor such that the jury may not have even heard her. The court explained that any concern about the reference to Taylor's criminal history had been handled with a limiting instruction. As to a history of substance use, the court held that the jury was provided properly

admitted evidence of Taylor's blood alcohol level prior to Tomei's testimony, such that her statement on that topic was not prejudicial. In summation, the trial court ruled "I cannot find, under the facts and circumstances of this situation, that the defendant is so prejudiced such that nothing short of a new trial would ensure that he will be tried fairly." The defense asked the court to instruct the jury to disregard the last comment about Taylor's request for his attorney. The court so instructed, stating: "Members of the jury, I instruct you to disregard the last couple of questions and answers that were given by Dr. Tomei."

The factual record before us necessarily guides our application of the well-established Weber test. We first contemplate the seriousness of the irregularity. When reviewing the series of irregularities as a whole, we are compelled to also consider who was responsible for the errant testimony; whether it was the result of a witness who misunderstood or disregarded instructions or whether the witness was misinformed or uninformed as the result of the actions, or inaction, of one of the attorneys. The record clearly demonstrates that Tomei was not properly advised as to the limitations for testimony that the court had placed on at least two important topics, despite the prosecutor's affirmative assertion to the court that they had so instructed the State's key witness. As such, the responsibility for the series of successive violations of rulings on motions in limine by a critical expert witness lies squarely with the State. ER 103(c) requires that: "In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means." It is reasonable to expect the litigators to carry out the intent of this evidence rule by

properly advising their witnesses prior to testimony. When trial irregularities are brought about by one of the attorneys, as opposed to a noncompliant witness, the seriousness increases. This is particularly true when, as here, the result is not a single misstatement, but a series of violations which requires opposing counsel to object again and again in the hopes of protecting their client's right to a fair trial.

When conduct by a party, in this case failing to inform a witness of pretrial rulings, gives rise to an irregularity, it creates a burden for the opposing party to object and seek redress from the court. This inherently establishes more prejudice; not only was an excluded topic referenced in front of the jury, but that act then forces counsel to weigh the value of objecting, which can call further attention to the improper testimony. Here, the prosecutor's failure to properly instruct their witness as to the court's limitations on her testimony, even after the first sustained defense objection, leads us to conclude that this cumulative error was very serious. The State's inaction with regard to Tomei forced Taylor to repeatedly object. Further, the trial was primarily focused on the conflicting opinions of experts as to Taylor's mental state such that Tomei's credibility and opinion were central to the State's case, which also contributes to the overall impact of the repeated violations. This first factor of the Weber test weighs heavily in Taylor's favor.

As to the second factor, whether the statement at issue was cumulative of other properly admitted evidence, only the substance use comment was cumulative of other evidence. As stated previously, the jury received evidence of Taylor's alcohol use that evening based on other testimony and the admission of

his blood results from the hospital which showed a BAC of .10g/100mL. The jury did not hear evidence of his past history with substance use of any kind. Neither was there other evidence presented that referenced Taylor's request for his attorney. Similarly, the comment regarding Taylor's criminal history was the sole reference to such in the record and was in no way cumulative. This Weber factor weighs in favor of Taylor.

The final factor, whether the irregularity was able to be cured by an instruction, reinforces why the record before us causes the seriousness inquiry to drive our conclusion on this issue. Both the reference to criminal history and the statement about Taylor asking for his attorney were followed by curative instructions. The reference to a "lengthy history" was not. In that instance, defense counsel objected and moved to strike. The court sustained, without a specific direction to strike, and then argument was taken up outside the jury that helped to clarify the pretrial ruling. The decision not to instruct the jury upon their return was likely due to the fact that the court recessed for a fifteen minute break so that it could take up argument and clarify the pretrial ruling. Had the court given an instruction to disregard the errant testimony after the jurors returned to the courtroom, it may have called more attention to the statement such that it would have countered the desired curative effect. Again, the repeated need to instruct only highlights the prejudice created by the State's inaction in terms of preparing its expert witness for trial. In isolation, each of these irregularities likely could have been resolved or mitigated with curative instructions, but the misstatements here accumulated quickly over the course of direct examination of a single key witness.

Trials are controlled by the judge hearing the case. Bill & Melinda Gates Found. v. Pierce, 15 Wn. App. 2d 419, 444, 475 P.3d 1011 (2020). However, as the other legal professionals involved in the process, attorneys also have a tremendous impact on the manner by which the proceedings unfold. See State v. Monday, 171 Wn.2d 667, 676, 257 P.3d 551 (2011) ("prosecutor owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated"); State v. Neidigh, 78 Wn. App. 71, 79, 895 P.2d 423 (1995) ("defense counsel should be aware of the law and make timely objection when the prosecutor crosses the line"); Ryan v. Ryan, 48 Wn.2d 593, 600, 295 P.2d 1111 (1956) ("should a breach of a canon of professional conduct be so flagrant that it can be said, as a matter of law, that the breach prevented a fair trial, a court should not hesitate to hold such breach of conduct prejudicial error, and grant a new trial."). Where the need for the court to repeatedly instruct and attempt to cure is created by one of the attorneys, as was the case here, the overall fairness of the trial may be eroded such that those attempts become futile. For this reason, the final Weber factor, whether the irregularity can be cured by instruction, weighs in Taylor's favor.

Applying the Weber test, and viewing the factors within the context provided in the record as to how these trial irregularities came about, we conclude that Taylor has met his burden of establishing an abuse of discretion as to the denial of his motion for mistrial. See State v. Lewis, 130 Wn.2d 700, 707, 927 P.2d 235 (1996). Escalona requires that we consider any prejudice from the erroneous denial of a motion for mistrial against the backdrop of the trial as a whole. 49 Wn. App. 251. This trial presented the jury with the primary question of whether Taylor

was able to form the requisite mental state for the charged crimes. The jury heard from two experts, one of whom violated motions in limine three times in rapid succession as a direct result of the State's failure to properly instruct her as to the court's rulings. This impermissibly burdened Taylor with repeated objections, motions to strike and requests for curative instructions, substantially increasing the prejudice to him such that nothing short of a new trial can ensure that he is tried fairly.

III.     Omission of a Mental State from the Diminished Capacity Instruction

Finally, Taylor argues the court committed error when it declined to include the mental state of recklessness in the diminished capacity instruction, but included all other relevant mental states. While our determination as to the motion for mistrial is dispositive, we reach this final issue in the event that the State elects to retry Taylor because the diminished capacity instruction provided to the jury here was erroneous.

The court properly instructed the jury as to the elements of assault in the second degree, the crime that the State alleged supported the felony murder charge. However, it declined to include the mental state of recklessness, which applies to assault in the second degree, within the diminished capacity instruction. This omission from the instructions constitutes instructional error.

We review alleged errors of law in jury instructions de novo. State v. Barnes, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005). "Jury instructions are proper when they permit the parties to argue their theories of the case, do not mislead the jury, and properly inform the jury of the applicable law." Id. "Jury instructions,

taken in their entirety, must inform the jury that the State bears the burden of proving every essential element of a criminal offense beyond a reasonable doubt." State v. Pirtle, 127 Wn.2d 628, 656, 904 P.2d 245 (1995). "It is reversible error to instruct the jury in a manner that would relieve the State of this burden." Id.

Diminished capacity is a mental condition not amounting to insanity, "that is demonstrated to have a specific effect on one's capacity to achieve the level of culpability required for a given crime." State v. Gough, 53 Wn. App. 619, 622, 768 P.2d 1028 (1989). A diminished capacity defense requires expert testimony. State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 626 (2001).

The relevant instructions that were provided to the jury are as follows:

Instruction No. 12[:]
A person commits the crime of assault in the second degree when he intentionally assaults another and thereby recklessly inflicts substantial bodily harm or assaults another with a deadly weapon.
. . .
Instruction No. 14[:]
A person is reckless or acts recklessly when he knows of and disregards a substantial risk that a wrongful act may occur and this disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation.

When recklessness as to a particular result or fact is required to establish an element of a crime the element is also established if a person acts intentionally as to that result or fact.
. . .
Instruction 11[:]
To convict Kevin Taylor of the crime of murder in the second degree-felony murder-in Count II, each of the following elements of the crime must be proved beyond a reasonable doubt:
    (1) That on or about September 3, 2016, Kevin Taylor committed assault in the second degree;
    (2) That Kevin Taylor caused the death of Julie Taylor in the course of and in furtherance of such crime;
    (3) That Julie Taylor was not a participant in the assault in the second degree; and
    (4) That this act occurred in the State of Washington.

> . . .
> Instruction 23[:]
> Evidence of mental illness or disorder may be taken into consideration in determining whether the defendant had the capacity to form intent, knowledge, or malice.

The diminished capacity instruction, 23, included all relevant mental states except recklessness. Recklessness was an essential element as to assault in the second degree, which must be proved beyond a reasonable doubt in order to convict on the felony murder charge. Instruction 12, the assault in the second degree instruction, properly included both mental states. See State v. Hayward, 152 Wn. App. 632, 640–45, 217 P.3d 354 (2009). Instruction 14 provided the jury with the definition of reckless and recklessness, properly explaining, in relevant part, that "[a] person is reckless or acts recklessly when he knows of and disregards a substantial risk." (Emphasis added). It is an unusual occurrence that a jury instruction includes a more serious mental state (knowledge) in its definition of a lesser mental state (recklessness), but that is precisely what this pattern instruction does. As such, it was improper to decline Taylor's request to include the mental state of recklessness in the diminished capacity instruction when the court instructed the jury as to diminished capacity with regard to knowledge.

Though the State argues on appeal that Taylor presented insufficient evidence to include recklessness in the diminished capacity instruction, this position has no merit. As an initial matter, this is a fundamentally different argument than the State presented when it opposed the inclusion of recklessness in the instructions at the trial court. There, the parties focused on whether recklessness was a mental state of assault in the second degree and therefore

must be included in the diminished capacity instruction. The State expressly took the position that it was not. This is incorrect. The sufficiency argument now presented by the State is not responsive to Taylor's framing of this assignment of error on appeal. However, our review of the trial testimony supports the conclusion that Taylor presented sufficient evidence to instruct on recklessness through Kanner. This expert testimony set out a proper evidentiary framework to indicate that diminished capacity was relevant to the jury's determination as to recklessness, such that a reasonable juror could find Taylor lacked the capacity to understand the consequences of his actions based on his mental condition. The omission of recklessness from jury instruction 23 was error. However, because our holding as to the motion for mistrial is dispositive, we need not determine whether the instructional error was harmless.

Reversed.

WE CONCUR:

_Mann, C.J._                    _Dwyer, J._