# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57944-8-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JOSIAH PAUL SWEENEY, | |
| Appellant. | |

CHE, J. — Josiah Sweeney appeals his convictions for two counts of aggravated first degree murder, first degree burglary, and felony violation of a protective order.

Before trial, Dr. Michelle Hart evaluated Sweeney for competency. Dr. Hart determined that Sweeney was competent to stand trial and that he presented with no active symptoms of a mental illness. Before sentencing, Dr. Alexander Patterson evaluated Sweeney multiple times. After trial and for the purposes of sentencing, Dr. Patterson submitted a report and was "fairly confident [] Sweeney meets criteria for schizophrenia." Clerk's Papers (CP) at 449 (emphasis omitted).

On appeal, Sweeney argues that (1) sentencing defendants with severe, diagnosed but untreated, mental illness to life in prison without the possibility of parole is cruel punishment under the federal and state constitutions, (2) he was deprived of effective assistance of counsel because his attorney failed to produce evidence that a mental illness prevented him from forming

the requisite mental state to commit the charged crimes and also failed to propose a diminished

capacity instruction, and (3) we should strike the crime victim penalty assessment (VPA).

We affirm the convictions but remand for the trial court to strike the VPA.

FACTS

I. BACKGROUND

In October 2021, law enforcement officers conducted a welfare check at the home of

Michael and Patricia Sweeney.[1]  In the home, they found the bodies of Michael and Patricia

Sweeney, who had been stabbed to death.  They also found Michael and Patricia Sweeney's son,

Josiah Sweeney, asleep in another room.  At the time, there was a no-contact order in effect,

prohibiting Sweeney from contacting Michael Sweeney or going to his father's home.

Detectives Kyle Kempke and Howard Reynolds detained and interviewed Sweeney.  In the

interview, Sweeney denied either stabbing or knowing what happened to his parents.

The State charged Sweeney with two counts of aggravated first degree murder, first

degree burglary, and felony violation of a protective order.  All counts carried a deadly weapon

enhancement and a domestic violence allegation.

In January 2022, at the request of Sweeney's counsel, the trial court ordered a

competency evaluation for Sweeney because "Sweeney has significant memory issues and

possibly processing issues that may interfere with his ability to assist in his defense. [] Sweeney

has demonstrated an inability to retain information communicated by [his attorney] as well as an

inability to recall past events."  CP at 41-42.  The competency evaluation order provided that the

---

[1] Because the last name is shared between Josiah Sweeney and his parents, we use "Sweeney" to
refer to the appellant, Josiah Sweeney, while we refer to his parents by their first and last name.

2

evaluation shall include, among other things, "[a] diagnosis or description of the current mental status of the defendant." CP at 44.

In February 2022, Dr. Michelle Hart evaluated Sweeney and filed a competency report. Her evaluation included, among other things, conducting an hour-long interview and mental state examination of Sweeney and reviewing available records such as notes made by jail mental health staff, from when Sweeney was previously incarcerated, which stated that Sweeney "'appears confused and unsure when answering . . . questions,'" and that he "'may be minimizing symptoms of [mental illness].'" CP at 55. Dr. Hart's report provided that Sweeney "demonstrated intact attention and concentration. His memory was intact for short-term, recent and remote. His intellectual functioning likely fell no lower than the average range, based on his vocabulary, abstract reasoning skills, and fund of information." CP at 56. The report further provided, "Sweeney presented in this evaluation with no active symptoms of mental illness." CP at 56. Dr. Hart concluded that Sweeney was competent to stand trial. Based on Dr. Hart's report, the trial court found Sweeney competent.

The matter proceeded to a jury trial and witnesses testified consistently with the facts above. Additionally, Detective Kempke testified that Sweeney was "very calm and sort of without emotion" during the beginning of the interview with Detectives Kempke and Hamilton. 3 Rep. of Proc. (RP) (Jan. 23, 2023) at 1332. However, Detective Kempke stated that Sweeney, when presented thereafter with "difficult and uncomfortable questions" from the detectives, "would hunch forward and had his hands—I guess it's called steepled where he would have his fingers together, and he would be shaking, and his legs were shaking so that his entire body was

trembling." 3 RP (Jan. 23, 2023) at 1333.[2] Kempke also described Sweeney as chewing on his tongue during these moments. According to Kempke, Sweeney's presentation was not consistent:

> So we could be in the middle of him shaking and trembling and there would be numerous occasions where he would -- you could see his entire body just stop. He would sit up, his whole demeanor would change, and he would start talking about going back to school or how he was gonna get to work or something completely not associated with the question that he'd just been asked.

3 RP (Jan. 23, 2023) at 1334.

In January 2023, jury trial commenced and the jury convicted Sweeney on all charges.

## II. SENTENCING

In Sweeney's sentencing brief, Sweeney argued that a sentence of life without the possibility of parole would be categorically unconstitutional as to individuals suffering from severe mental illnesses under the constitutional prohibition on cruel punishment, and Sweeney argued that he was suffering from such an illness. Sweeney largely argued that persons suffering under such mental illnesses are similar to children for sentencing purposes. Sweeney attached to his sentencing brief a February 2023 report by Dr. Alexander Patterson.

Dr. Patterson generated the February 2023 report following Sweeney's counsel's request to evaluate "apparent cognitive and/or psychiatric symptoms" Sweeney presented while detained in jail and to do this evaluation for the purposes of sentencing mitigation. CP at 443. In introducing his report, Dr. Patterson stated that Sweeney's counsel "initially requested a psychological evaluation to clarify the nature of these symptoms and to what degree they may

---

[2] Detectives Kempke and Reynolds also assumed a hunched-over stance several times during their interrogation of Sweeney.

have contributed to [Sweeney's] crimes." CP at 443. Dr. Patterson explained that, in conducting his evaluation, he had interviewed Sweeney three times between February 2022 and July 2022, administered three different tests, reviewed Dr. Hart's competency evaluation report which discussed the jail mental health records, and also reviewed the case's discovery materials. While Dr. Patterson commented that "[d]iscovery information relevant to [] Sweeney's mental health was rather sparse," he mentioned reviewing, among other things, comments made by Sweeney's neighbors to police that he "had 'mental problems' and 'needed mental health help,'" and recordings of a police interrogation. CP at 447.

Dr. Patterson's report noted that, after completing his first interview with Sweeney, "[Dr. Patterson] initially suspected [] abnormalities [in Sweeney's speech, behavior, and complained of symptoms during the interview] were the result of schizophrenia, although [Dr. Patterson] was not confident in this impression as the available information was relatively sparse." CP at 448-49. However, at the time of the report's filing, Dr. Patterson was "fairly confident [] Sweeney meets criteria for schizophrenia." CP at 449 (emphasis omitted). The report further provided that it was "difficult to comment on the potential nexus between Mr. Sweeney's mental illness and the crimes" but it was "likely" that Sweeney was symptomatic at the time of the crimes and that such symptoms possibly motivated the crimes. CP at 450. Dr. Patterson noted that the aforesaid conclusions were "obviously speculative" but also that "there is a non-trivial possibility that symptoms of [Sweeney's] mental condition played a direct role in his crimes." CP at 450.

At his sentencing hearing, Sweeney stated that he "[was] not aware of any national consensus with regard to life without parole for the class of individuals that we're discussing

5

here." RP (Feb. 27, 2023) at 1898. In arguing that Sweeney was a member of the class,

Sweeney referred the trial court to Dr. Patterson's report. Sweeney's counsel stated:

> [T]here are mental health defenses, diminished capacity and insanity. The report from Dr. Patterson was initially -- the defense asked for Dr. Patterson to do his evaluations in order to explore those defenses. In the report, you can see [Dr. Patterson] was not able to opine on a nexus between the mental illness and the formation of intent or -- for the purposes of diminished capacity or the ability to perceive the nature and quality of the acts for the purposes of insanity.

RP (Feb. 27, 2023) at 1893-94. Sweeney's counsel then stated, "We're not trying to

retroactively say that either of those defenses would be appropriate in this case, but [the report] is

a diagnosis." RP (Feb. 27, 2023) at 1894.

The trial court found that Sweeney failed to establish a diagnosis of schizophrenia

beyond a reasonable doubt or even by a preponderance of the evidence considering Dr. Hart's

initial report which found no mental illness, the late timing of Dr. Patterson's report, and "Dr.

Patterson's equivocation." RP (Feb. 27, 2023) at 1908. The trial court further found that, even if

Sweeney established a mental illness diagnosis, Sweeney failed to show that a life without parole

sentence is categorically unconstitutional as applied to a class of individuals suffering from

mental illnesses.

The trial court sentenced Sweeney to life imprisonment without the possibility of parole,

found Sweeney indigent for the purposes of determining legal financial obligations, and imposed

the VPA.

## ANALYSIS

### I. CRUEL PUNISHMENT

Sweeney argues that RCW 10.95.030—which requires mandatory life sentences without

parole for persons convicted of first degree aggravated murder—is categorically unconstitutional

6

as to persons with a "diagnosed but untreated mental illness" as it constitutes cruel punishment under both the state and federal constitutions. Br. of Appellant at 21.

A.     *Legal Principles*

When a defendant is found guilty of first degree aggravated murder, the trial court must sentence them to life imprisonment without the possibility of parole. *State v. Moen*, 4 Wn. App. 2d 589, 598, 422 P.3d 930 (2018) (citing RCW 10.95.030(1)).  To date, our courts have only recognized one very narrow exception for when such a sentence would be categorically unconstitutional. *See State v. Carter*, 3 Wn.3d 198, 232, 548 P.3d 935 (2024) (holding that, for youthful offenders with first degree aggravated murder convictions, determinate sentences are permissible because Washington case law has held that sentencing youthful offenders to mandatory life sentences without the possibility of parole is unconstitutional).  Outside of this limited circumstance, RCW 10.95.030(1) "does not give a trial court discretion to consider mitigating factors and depart from the prescribed life sentence." *Moen*, 4 Wn. App. 2d at 598.

We presume a statute is constitutional and review the constitutionality of a statute de novo. *Id.* "The party challenging the statute bears the burden of proving its unconstitutionality beyond a reasonable doubt." *Id.*

B.     *Membership in the Proposed Constitutionally-Protected Class of Those with a Severe, Diagnosed but Untreated, Mental Illness*

Sweeney asserts that the trial court erred in determining that Sweeney failed to prove a schizophrenia diagnosis and, thus, erred in finding that Sweeney did not qualify as a member of Sweeney's proposed protected class.  We disagree that the trial court erred in finding that Sweeney failed to prove a schizophrenia diagnosis and, because Sweeney fails to show he was

part of any proposed constitutionally-protected class, we do not directly address his cruel punishment constitutional argument.

1.      Standard of Review

Because "we do not make determinations on constitutional issues unless necessary to the determination of a case," we must first consider Sweeney's contention that the trial court erred in finding that Sweeney failed to prove a schizophrenia diagnosis. *State v. Rice*, 159 Wn. App. 545, 561, 246 P.3d 234 (2011) (citing *State v. Hall*, 95 Wn.2d 536, 539, 627 P.2d 101 (1981)). This is so because Sweeney's claim that his sentence is unconstitutional relies on the argument that such a sentence is unconstitutional to impose on those with a severe, diagnosed but untreated mental illness. In order for Sweeney's argument to succeed for the purpose of determining *his case*, Sweeney must, thus, be a member of such a class. *See Hall*, 95 Wn.2d at 539 (declining to pass judgment on a constitutional issue when such was not "absolutely necessary" per the facts in the case).

Unless we find a "clear abuse of discretion or misapplication of the law," we will not reverse a sentencing court's decision. *Carter*, 3 Wn.3d at 212. An abuse of discretion occurs if the trial court's decision is "manifestly unreasonable or based upon untenable grounds." *Id.* (quoting *State v. Haag*, 198 Wn.2d 309, 317, 495 P.3d 241 (2021)). A decision is manifestly unreasonable if the trial court "adopts a view 'that no reasonable person would take,' and arrives at a decision 'outside the range of acceptable choices.'" *State v. Castillo-Lopez*, 192 Wn. App. 741, 746, 370 P.3d 589 (2016) (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)). "Untenable grounds consist of factual findings that are unsupported by the record." *Carter*, 3 Wn.3d at 212.

We review a trial court's factual findings by evaluating whether its findings are supported by "substantial evidence." *Carter*, 3 Wn.3d at 212. Evidence is substantial if "'there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding.'" *Carter*, 3 Wn.3d at 212 (quoting *Haag*, 198 Wn.2d at 317). However, our review does not extend to weighing the evidence or determining witness credibility. *State v. Boyer*, 200 Wn. App. 7, 13, 401 P.3d 396 (2017) (citing *Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009)).

2.     The Trial Court Did Not Err in Determining that Sweeney Did Not Establish Membership in the Proposed Class at the Center of His Constitutional Claim

Sweeney argues that the trial court erred in finding that Sweeney did not have a severe, diagnosed but untreated mental illness. Br. of Appellant at 41. We disagree.

First, Sweeney contends that the trial court erred in its conclusion that Sweeney failed to establish that he suffered from schizophrenia because the trial court "in part . . . viewed Dr. Patterson's diagnosis as 'speculative.' " Br. of Appellant at 41. However, Sweeney mischaracterizes the trial court's findings. In the portion of the record Sweeney cites to for this contention, the trial court never stated that it based its finding on concluding that Dr. Patterson's diagnosis was "speculative." *See* Br. of Appellant at 41 (citing RP (Feb. 27, 2023) at 1907-08).[3] Instead, the trial court stated it found "Dr. Patterson's *equivocation*" relevant to its conclusion that "the diagnosis of [] Sweeney of schizophrenia is not established beyond a reasonable

---

[3] The only mention of speculation in the two pages Sweeney points to is when the trial court discusses how "[m]uch of Dr. Patterson's opinions are framed in terms of saying that his opinions are that it is possible *or speculative* in terms of the possible state of [] Sweeney at the time of the murders and the connection between the diagnosis and the crimes." RP (Feb. 27, 2023) at 1907-08 (emphasis added).

doubt . . . [nor] a lower standard by a preponderance." RP (Feb. 27, 2023) at 1908 (emphasis added). Because equivocation connotes credibility, the trial court's finding here appears to speak more to Dr. Patterson's credibility as opposed to whether the diagnosis itself was speculative.[4]

Even if the trial court based its determination on finding Dr. Patterson's diagnosis speculative, a reasonable, fair-minded person would have come to such a conclusion after examining the evidence presented. While Dr. Patterson's report at one point stated that "Sweeney has a severe mental illness" as well as "I am *fairly* confident [] Sweeney meets criteria for schizophrenia," his report also contained statements of uncertainty in the diagnosis when defense counsel initially engaged Dr. Patterson's opinion and around the time Dr. Hart completed her evaluation. CP 449-50 (emphasis added). Dr. Patterson stated, "I initially suspected [] abnormalities [in Sweeney's speech, behavior, and symptoms complained of during the interview] were the result of schizophrenia, although [I] was not confident in this impression as the available information was relatively sparse." CP at 448-49.

However, Dr. Patterson offered no explanation why a schizophrenia diagnosis came several months after his last meeting with Sweeney in July 2022 and almost a month after trial in February 2023 when Sweeney had no history of mental health diagnoses or treatment. Nothing in Dr. Patterson's report suggests that he conducted additional interviews with Sweeney in the nearly six-month gap between their last interview and sentencing, and, yet, the evidence Dr. Patterson relies on for his diagnosis is overwhelmingly based on impressions from his previous

---

[4] "Equivocation" is synonymous with "uncertainty, evasiveness, [and] prevarication." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 769 (3rd ed. 2002).

interviews. Considering this evidence, a reasonable, fair-minded person would have concluded that Dr. Patterson's report provided speculation of a mental illness diagnosis.

Second, Sweeney contends that the timing of Dr. Patterson's report was irrelevant because "evidence known to the parties and court well before sentencing also established that [Sweeney] was suffering from a previously undiagnosed and untreated mental illness." Br. of Appellant at 41-42. Sweeney relies on both the trial judge's initial concern about Sweeney's competency, as evidenced by the judge's order for evaluation, and the observations of the jail mental health staff. But Sweeney's counsel initiated the competency evaluation, the trial court appears to have ordered the competency evaluation based on representations by Sweeney's counsel, and the jail mental health staff's concerns were already considered by Dr. Hart who did not find Sweeney met any mental illness criteria and whose report the trial court relied on in finding Sweeney competent.[5]

Further, the equivocal nature and timing of Dr. Patterson's report were just two reasons the trial court provided for why it found Sweeney failed to meet his burden in establishing a schizophrenia diagnosis. In its analysis, the trial court also stated that the timing of Dr. Hart's report and its contents also were instructive in deciding whether Sweeney met his burden. Dr. Hart's report, while for a different purpose, also evaluated Sweeney's mental state closer in time

---

[5] Sweeney additionally argues that Dr. Patterson's report noted that neighbors spoke with investigators and stated that Sweeney "had 'mental problems' and 'needed mental health help,' " which established a mental illness. Br. of Appellant. at 42. But Dr. Patterson's report, immediately following presenting the neighbors statements, then noted that "[v]ery few details were provided" to law enforcement. CP at 447. Without any additional context for the statements or information provided to the trial court, a reasonable, fair-minded person would have found the neighbor's comments insufficient to establish a mental health diagnosis in light of the other evidence presented to the trial court, including the opinions of two psychologists. And our review does not extend further into weighing evidence. *Boyer*, 200 Wn. App. at 13.

to the crimes and opined that "it does not appear that [] Sweeney meets diagnostic criteria for any mental health diagnosis." CP at 57.

Because a reasonable, fair-minded person considering the evidence in the record would have doubted Sweeney's schizophrenia diagnosis, we hold that the trial court did not err in its finding. As Sweeney fails to establish membership in the very class of defendants he argues is being unconstitutionally punished, we decline to consider further whether a life without the possibility of parole sentence is unconstitutionally cruel as applied to defendants with a severe, diagnosed but untreated, mental illness as that question is not necessary to determining Sweeney's case. *See Rice*, 159 Wn. App. at 561.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Sweeney argues that he was deprived of effective assistance of counsel because his attorney failed to produce evidence that a mental illness prevented Sweeney from forming the requisite mental state to commit the charged crimes. Additionally, Sweeney argues that his attorney deficiently performed by failing to propose a diminished capacity instruction. Sweeney contends that these failures by his counsel prejudiced his defense at trial. We disagree.

A.      *Legal Principles*

Both the Sixth Amendment to the United States Constitution and article 1, section 22 of the Washington Constitution guarantee defendants effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). However, we give "great deference to trial counsel's performance and begin[] the analysis with a strong presumption that counsel was effective." *State v. Crow*, 8 Wn. App. 2d 480, 507, 438 P.3d 541 (2019).

12

To demonstrate that counsel's performance was constitutionally ineffective, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *State v. Cienfuegos*, 144 Wn.2d 222, 227, 25 P.3d 1011 (2001). A defendant demonstrates deficient performance by showing that counsel's performance "fell below an objective standard of reasonableness based on consideration of all the circumstances." *Crow*, 8 Wn. App. 2d at 507. A defendant must show, based on the record, "the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012) (quoting *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995)). To demonstrate prejudice, a defendant must show that "but for the ineffective assistance, there is a reasonable probability that the outcome would have been different." *Cienfuegos*, 144 Wn.2d at 227. Because a defendant must establish both deficient performance and prejudicial effect, "the failure to show either prong will end our inquiry." *State v. Case*, 13 Wn. App. 2d 657, 673, 466 P.3d 799 (2020).

To establish an insanity defense, a defendant must show, by the preponderance of the evidence, that:

> (1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:

> (a) He or she was unable to perceive the nature and quality of the act with which he or she is charged; or

> (b) He or she was unable to tell right from wrong with reference to the particular act charged.

RCW 9A.12.010.

Additionally, if there is substantial evidence that a defendant has a mental illness and evidence logically connecting that illness to the defendant's inability to possess the required

level of culpability for the charged crime, then a diminished capacity instruction must be given. *Cienfuegos*, 144 Wn.2d at 227. However, a failure to request a diminished capacity instruction "is not ineffective assistance of counsel per se." *Id.* at 229. Instead, determining whether Sweeney was deprived of effective assistance of counsel because counsel did not request a diminished capacity instruction presents three questions: (1) whether Sweeney was entitled to a diminished capacity instruction, (2) whether it was deficient performance for counsel to not have requested that instruction, and (3) whether the failure to request that instruction sufficiently prejudiced Sweeney's defense. *Id.* at 227.

"'Diminished capacity' is a mental condition, not amounting to insanity, 'that is demonstrated to have a specific effect on one's capacity to achieve the level of culpability required for a given crime.'" *State v. Taylor*, 18 Wn. App. 2d 568, 585, 490 P.3d 263 (2021) (quoting *State v. Gough*, 53 Wn. App. 619, 622, 768 P.2d 1028 (1989). Expert testimony is required to present a diminished capacity defense. *Taylor*, 18 Wn. App. 2d at 585. And "[e]xistence of a mental disorder is not enough, standing alone, to raise an inference that diminished capacity exists, nor is conclusory testimony that the disorder caused a diminution of capacity. The testimony must explain the connection between the disorder and the diminution of capacity." *Gough*, 53 Wn. App. at 622; *see also State v. Clark*, 187 Wn.2d 641, 651, 389 P.3d 462 (2017).

B.      *Sweeney Fails to Show that His Attorney Performed Deficiently in Not Presenting Evidence of a Mental Illness at Trial*

Sweeney argues that his defense counsel should have presented evidence of Sweeney's mental illness at trial to show that he did not have the requisite mental state for the charged

crimes and should have requested a diminished capacity instruction.[6]  Sweeney asserts that his counsel should have suspected he had a mental health illness before trial because, during his interview with Detective Kempke, (1) Sweeney was emotionless at the start of the interview, (2) Sweeney placed his hands in a steepled position, chewed on his tongue, and shook uncontrollably in response to difficult questions, and (3) Sweeney strayed off topic and gave irrelevant answers to Detective Kempke's questions.

We disagree with Sweeney's contention that his counsel deficiently performed based on these facts.  Clearly, Sweeney's counsel recognized that Sweeney may have suffered from a mental health illness and took reasonable steps to evaluate both competency and the viability of relative defenses prior to trial.  Only a few months after Sweeney's arrest, Sweeney's counsel requested a competency evaluation, which included an evaluation of "the current mental status of the defendant."  CP at 44.  Also, around that same time, Sweeney's counsel retained Dr. Patterson to independently explore diminished capacity and insanity defenses.  Despite Dr. Patterson's post-sentencing report explaining his diagnosis of Sweeney, the report was not created prior to trial and so Sweeney's counsel could have neither advanced an insanity defense nor requested a diminished capacity instruction based on the report.  *See* RCW 10.77.030 (requiring a defendant to file written notice of their intent to rely on such a defense before trial); *Taylor*, 18 Wn. App. 2d at 585 ("A diminished capacity defense requires expert testimony.").

---

[6] At trial, Sweeney's counsel argued that the State failed to meet its burden of establishing beyond a reasonable doubt the requisite mental state for first degree murder and general denial regarding all the charges. *See e.g.*, 3 RP (Jan. 26 2023) at 1536; 4 RP (Jan. 30, 2023) at 1753.

Furthermore, at sentencing, Sweeney's counsel explained why they did not pursue either an insanity or diminished capacity defense at trial, and, even, stated that Dr. Pattersondid not support such defenses:

> The report from Dr. Patterson was initially -- the defense asked for Dr. Patterson to do his evaluations in order to explore those defenses. In the report, you can see [Dr. Patterson] was not able to opine on a nexus between the mental illness and the formation of intent or -- for the purposes of diminished capacity or the ability to perceive the nature and quality of the acts for the purposes of insanity.

RP (February 27, 2023) at 1893-94. As Dr. Patterson could not opine on a connection between any mental illness of Sweeney and the circumstances of the crime, Sweeney's counsel had a strategic reason for not pursuing such defenses at trial and not requesting Dr. Patterson to write his report prior to sentencing. *See* RCW 9A.12.010 (for an insanity defense, evidence a defendant must establish includes that "at the time of the commission of the offense, as a result of mental disease or defect" his state of mind was affected to a certain degree); *Gough*, 53 Wn. App. at 622 (for a diminished capacity defense, expert testimony "must explain the connection between the disorder and the diminution of capacity."). And Sweeney can point to no other evidence on the record that would have supported either an insanity or a diminished capacity defense.

Thus, under these circumstances, Sweeney fails to show that his counsel's failure to produce evidence of a mental illness during the trial or present either a diminished capacity or insanity defense at trial was without legitimate strategic or tactical reasons or otherwise deficient performance. Because Sweeney does not show that defense counsel deficiently performed, Sweeney's claim of ineffective assistance of counsel fails before reaching the prejudicial effect

prong of the analysis. *See Case*, 13 Wn. App. 2d at 673. We hold that counsel's performance was not constitutionally ineffective.

### III. VPA

Sweeney argues we should strike the VPA from his judgment and sentence because the trial court found him indigent for the purposes of appeal. The State does not oppose striking the VPA. "Effective July 1, 2023, RCW 7.68.035(4) prohibits courts from imposing the crime victim penalty assessment on indigent defendants." *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048, *pet. for rev. filed*, 102378-2 (2023). And that amendment applies to cases on direct appeal. *Ellis*, 27 Wn. App. 2d at 16. We remand for the trial court to strike the VPA from Sweeney's judgment and sentence.

### CONCLUSION

We affirm Sweeney's convictions, but remand for the trial court to strike the VPA.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Veljacic, A.C.J.

Price, J.