IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80563-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JEREMY JOSEPH SIMMONS, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — Jeremy J. Simmons was convicted as charged of two counts of murder in the first degree, one count of assault in the first degree, and one count of unlawful possession of a firearm in the first degree. The first three counts also carried firearm enhancements which were found by special verdict. Based on his criminal history, Simmons was sentenced as a persistent offender to life in prison without the possibility of parole.

On appeal, Simmons challenges the court's hardship dismissal of a juror as both an improper closure of the court and a violation of his right to be present during the proceedings. He further asserts error as to search warrants for cell phone information, a number of evidentiary rulings by the trial court, and the denial of both a motion to dismiss for government misconduct under CrR 8.3(b) and motion for mistrial. He avers that the prosecutor engaged in misconduct at several points during closing argument. Finally, Simmons challenges the use of a most

serious offense, committed when he was a juvenile, as a predicate offense in the imposition of a life sentence as a persistent offender on the grounds that such practice is a violation of our state constitution. We disagree with Simmons' arguments on appeal and affirm.

FACTS

Just after midnight on November 2, 2017, Shon Tiea Brister, Raymond Myles, Jr., and Brandon Washington were shot in downtown Seattle. Washington survived, but Brister and Myles died at the scene. Washington was captured on the recorded 911 call and on body cam footage of one of the responding officers identifying one of the shooters as "Green Eyes" and he repeated that identification to officers when he was later interviewed at Harborview Medical Center. In the time following the shooting, several witnesses came forward and identified the shooters by providing various street names by which they knew them. The investigation suggested there was a second shooter involved in the incident, initially identified as "Big Baby."[1] Each of the witnesses who provided those names to police indicated that they personally knew the individual they identified.

Washington had provided police with a phone number saved in his cell phone contacts for Green Eyes. Police obtained a search warrant for the subscriber information for that phone number and learned that Jeremy Simmons was the account holder. The search warrant allowed police to access the call log information, as well as cell site location information (CSLI), associated with the

---

[1] The State alleges that Big Baby is Nyagah Baker-Williams and charged him as a co-defendant. However, Simmons proceeded to trial alone.

phone number. Simmons was later arrested in Mexico and turned over to US federal authorities at the U.S./Mexico border in San Ysidro, California, along with three cell phones that were marked, logged, and transported with him as his property. A Deputy US Marshal who had been in contact with the Seattle Police Department (SPD) about Simmons' apprehension, transported him from the border to the San Diego Central Jail for booking. The cell phones were transferred with Simmons. Simmons was extradited from California to Washington and SPD seized the phones as evidence.

Simmons was charged with two counts of murder in the first degree, each with a firearm enhancement, as to Brister and Myles; one count of assault in the first degree with a firearm enhancement as to Washington; and one count of unlawful possession of a firearm in the first degree.[2] Because Simmons' criminal history included two prior most serious ("strike") offenses, he faced a mandatory sentence of life in prison without the possibility of parole as a persistent offender. Simmons brought numerous pretrial motions on evidentiary matters, including challenging the search warrants for data from the phones that were transported into the U.S. as his property and the admissibility of text messages extracted from them. He also brought a CrR 8.3(b) motion to dismiss for government misconduct, based on what he asserted was an unlawful arrest in Mexico, which was denied.

Prior to the start of testimony, Simmons objected to the hardship dismissal the court granted to a person selected as an alternate juror, as well as the process

---

[2] Simmons resolved the unlawful possession of a firearm in the first degree charge by entering a guilty plea prior to proceeding to trial on the remaining charges. He was sentenced on all counts at a separate sentencing hearing after the conclusion of trial.

by which the dismissal occurred. Additionally, Simmons challenged the identification procedure used by SPD with various eyewitnesses and objected to the court's decision allowing the witnesses to make in-court identifications. Ultimately, the jury convicted Simmons as charged and the court sentenced him to life in prison without the possibility of parole, pursuant to the Persistent Offender Accountability Act (POAA).[3] Simmons now appeals.

## ANALYSIS

I.     Hardship Dismissal of Alternate Juror

Simmons first argues it was error for the trial court to excuse a juror based on hardship. He asserts that this violated both his right to a public trial and right to be present. Prior to the jury being sworn, during a planned recess that spanned multiple weeks, the trial court excused the third alternate juror. The juror informed the court via email that her 93-year-old father was admitted to the hospital with congestive heart failure and advised that she held power of attorney for him. The court forwarded the juror's email to both parties. The defense responded approximately an hour later, but after business hours, and requested a hearing on the matter. The juror had already been excused for hardship by the time this email was sent. The judge filed the email thread with the juror in the court file and held a hearing on the issue a few days later.

---

[3] RCW 9.94A.570.

A.      Courtroom Closure and the Right to a Public Trial

Both the Sixth Amendment of the United States Constitution and article I, section 22 of the Washington State Constitution guarantee a criminal defendant the right to a public trial.  State v. Wise, 176 Wn.2d 1, 9, 288 P.3d 1113 (2012). "In order to protect the accused's constitutional public trial right, a trial court may not close a courtroom without, first, applying and weighing five requirements as set forth in [State v. Bone–Club] and, second, entering specific findings justifying the closure order."  State v. Easterling, 157 Wn.2d 167, 175, 137 P.3d 825 (2006) (citing Bone-Club, 128 Wn.2d 254, 258–59, 906 P.2d 325 (1995)).  "These requirements mirror the requirements applied to protect the public's article I, section 10 right to open proceedings."  Id.  However, our state's Supreme Court has held that "not every interaction between the court, counsel, and defendants will implicate the right to a public trial or constitute a closure if closed to the public." State v. Sublett, 176 Wn.2d 58, 71, 292 P.3d 715 (2012).  "Whether a criminal accused's constitutional public trial right has been violated is a question of law, subject to de novo review on direct appeal."  Easterling, 157 Wn.2d at 173–74. Such a claim may be raised for the first time on appeal.  Wise, 176 Wn.2d at 9.

Before resolving the question of whether a trial court violated a defendant's right to a public trial, the reviewing court must determine whether "the proceeding at issue implicates the public trial right, thereby constituting a closure at all." Sublett, 176 Wn.2d at 71.  Here, as the State points out, our state has affirmatively rejected the assertion that hardship determinations implicate the public trial right. See State v. Russell, 183 Wn.2d 720, 730–31, 357 P.3d 38 (2015) (court holding

a work session within chambers to go over juror questionnaires for potential hardship did not implicate public trial right); State v. Schierman, 192 Wn.2d 577, 607–08, 438 P.3d 1063 (2018) (no public trial right implicated by preliminary hardship excusal determination made during meeting between counsel and court administrator); State v. Jones, 185 Wn.2d 412, 426, 372 P.3d 755 (2016) (no public trial right implicated where judicial assistant randomly drew the alternate jurors during recess); State v. Wilson, 174 Wn. App. 328, 329–30, 298 P.3d 148 (2013) (when bailiff excused two jurors for illness prior to voir dire, no implication of public trial right). Simmons fails to engage with the applicable legal precedent raised by the State. As the court's dismissal here was based on hardship, the fact that it occurred via email does not constitute an improper closure of the court. Because we do not find that a closure occurred, we need not engage in the Bone-Club analysis.

        B.      Defendant's Right to be Present

We review de novo an assertion of violation of a defendant's constitutional right to be present during criminal proceedings. State v. Irby, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). A person charged with a crime has a fundamental right to be present at all critical stages of a trial. Id.

Simmons relies on Irby to argue that he was denied his right to be present at a critical stage when the trial court dismissed the alternate juror for hardship through email, without opportunity for the parties to provide input. Irby is distinguishable, however, as it involved for-cause challenges to potential jurors based on their responses to an initial questionnaire. Id. at 877–78. A for-cause

challenge is distinct in that it is subject to argument by the parties, the challenged juror may be rehabilitated such that the cause that gave rise to the motion to strike dissipates or is resolved, and a defendant may have meaningful input to help the process. As noted in Irby, the evaluation of for-cause challenges based on questionnaire is an evaluation of "the ability of particular jurors to try this specific case." Id. at 882.

The situation presented here differs from Irby in that this was a hardship dismissal; one that was medically urgent, very serious and where input from the parties would be highly unlikely to impact the court's ruling. See RCW 2.36.100. It is noteworthy that the error in Irby was found to be prejudicial because "the State cannot prove beyond a reasonable doubt that the removal of several jurors in Irby's absence had no effect on the verdict." Id. at 887. The reasoning was that the court could not speculate as to how the prospective jurors dismissed for-cause may have deliberated had they been seated. In Simmons' case, even if we assumed error as to the hardship dismissal, we can conclude that it would be harmless beyond a reasonable doubt since the excused juror was one of multiple alternates. The record demonstrates that the case proceeded to verdict without the use of any alternate jurors. That critical fact guides our determination on this issue; had the excused juror been one of the first twelve, our analysis and outcome could be different.

II.     Privacy Act Challenge to Cell Phone Communication

Simmons argues that it was error for the trial court to have admitted into evidence text messages retrieved from one of his cellphones, specifically that such

an admission is a violation of Washington's privacy act, chapter 9.73 RCW. This argument was not properly preserved. Appellate courts generally will not consider issues raised for the first time on appeal. RAP 2.5(a); State v. McFarland, 127 Wn.2d 322, 332–33, 899 P.2d 1251 (1995). The record demonstrates that Simmons did not raise a privacy act challenge to the text messages recovered from his phone. Rather, he brought an unsuccessful motion to suppress certain records from the carrier, T-Mobile, particularly data saved in cloud storage, but no such evidence was recovered by SPD nor admitted at trial. As such, a privacy act challenge to the admission of the text messages extracted from the cell phones is raised now for the first time and we decline to reach it.

III.     Motion for Mistrial

Simmons avers that the trial court abused its discretion in denying a motion for a mistrial that he advanced during trial. The motion was based on two grounds: first, the court's failure to require Washington to answer a question during cross-examination after he flatly refused; and second, the trial court's admission of Washington's prior statement to law enforcement on re-direct. We review a trial court's denial of a motion for a mistrial for abuse of discretion. State v. Gamble, 168 Wn.2d 161, 177, 225 P.3d 973 (2010). "The Supreme Court of our state has indicated a trial court should only grant a mistrial when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be tried fairly." State v. Taylor, __ Wn, App. __, 490 P.3d 263, 270 (2021). The prejudice is considered against the "backdrop of the trial as a whole." Id. Additionally, we review a court's rulings on admission of evidence for abuse of

discretion. State v. Simms, 151 Wn. App. 677, 692, 214 P.3d 919 (2009). In reviewing the denial of a motion for mistrial, we apply the Weber factors: "1) the seriousness of the irregularity, 2) whether the statement at issue was cumulative of other properly admitted evidence, and 3) whether the irregularity was able to be cured by an instruction to disregard the improper testimony, which the jury is presumed to follow." Taylor, 490 P.3d at 270 (citing State v. Weber, 99 Wn.2d 158, 165–66, 659 P.2d 1102 (1983)).

We necessarily must first consider whether the issues cited as the basis for the motion for mistrial were, in fact, irregularities. The trial court allowed the State to admit the prior statements by Washington under the rule of completeness, because defense counsel opened the door during cross-examination and the judge ruled it was within its discretion to not require Washington to answer the question of who else he was with at a birthday party earlier on the evening of the killings. On appeal, Simmons focuses on the propriety of these rulings as the basis for his assertion that the trial court erred in denying his motion for mistrial.

A.      Washington's Refusal to Answer During Cross-Examination

It was not error for the court to decline to order Washington to answer defense's question on cross-examination about events in the hours before the incident. Washington was testifying about being at a birthday party prior to the shooting and the following exchange occurred:

Q. Now, who was at this party you had with Ray?
A. Me and a couple buddies.
Q. Who? What are their names?
A. Doesn't matter.
Q. It doesn't matter?

A. Nope.

Q. You know their names?

A. Yes. Does not matter.

Q. But you won't divulge them?

A. They're not—it doesn't matter of this case.

[Defense Counsel]: Your Honor, I'd ask the court to instruct the witness to answer the question.

The Court: I am not going to do that, [Defense Counsel].

[Defense Counsel]: Your Honor, then I would move to strike his testimony. He needs to answer the question here.

The Court: I'm not going to do that, either, Counsel.

[Defense Counsel]: Then I would object to that, Your Honor.

The Court: It's overruled.

Q (By [Defense Counsel]:) So you won't give us the names of your buddies?

A. That's what I said. Doesn't matter.

A defendant has no constitutional right to admit irrelevant evidence. State v. Thomas, 150 Wn.2d 821, 857, 83 P.3d 970 (2004). "Evidence is relevant if it has any tendency to make any fact that is of consequence to the case more or less likely than without the evidence." Id. at 858 (citing ER 401). "A trial court's decision to admit evidence is reviewed for abuse of discretion." State v. Sexsmith, 138 Wn. App. 497, 504, 157 P.3d 901 (2007). While Simmons claims this was error, he fails to articulate why this information was relevant such that admission would be proper. Neither does he advance any authority that would support his claim of error. In the absence of authority or argument to the contrary, we are unpersuaded by Simmons' claim of error as to this ruling. See In re Det. of Ruston, 190 Wn. App. 358, 373, 358 P.3d 935 (2015) ("We do not consider conclusory arguments that are unsupported by citation to authority."). The court did not abuse its discretion in declining to order Washington to answer this question.

B.     Admission of Washington's Prior Statements under ER 106

The other basis Simmons offered for his motion for mistrial is an assertion that the trial court committed error by allowing the State to introduce prior statements Washington made to police.  A critical fact in our analysis is that the prior statements were admitted only after the defense's cross-examination of Washington, wherein certain portions of his statement to police were strategically selected and presented in a manner that suggested Washington had reported that Baker-Williams was the only shooter.  The trial court ruled that the State could rehabilitate the witness via prior statements under the rule of completeness.  See ER 106.

ER 106 provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the party at the time to introduce any other part, or any other writing or recorded statement, which ought in fairness to be considered contemporaneously with it.

The rule clearly applies in this instance.  Defense counsel made a strategic decision to inquire about prior statements Washington had made regarding the shooting, but chose to present them in a limited fashion to give the appearance that Washington reported only one shooter, Baker-Williams.  This tactical decision by counsel opened the door for the State to inquire about the statements in a more complete fashion under ER 106 to clarify the true context and content for the jury.  As such, the trial court's ruling on this matter was not error.

Because neither of the grounds for Simmons' motion for mistrial constitute error or trial irregularities, we need not engage with the Weber factors to determine whether the court abused its discretion in denying the motion.

IV.     Out-of-Court Identification Procedures.

Simmons next asserts that the trial court erred by not suppressing his out-of-court identification by a number of witnesses based on the police procedure used.   An out-of-court identification violates due process if the procedure is so suggestive as to give rise to a very substantial likelihood of irreparable misidentification.   State v. Vickers, 148 Wn.2d 91, 118, 59 P.3d 58 (2002). Simmons bears the burden of establishing that the procedures used were impermissibly suggestive. Id.  In reviewing a claim of an impermissibly suggestive identification procedure, we employ a two-step process.  First, Simmons must show the procedure was impermissibly suggestive.  State v. Ramires, 109 Wn. App. 749, 761, 37 P.3d 343 (2002).  If he meets this burden, the court then determines whether the photo identification contained "sufficient indicia of reliability despite the suggestiveness."  Id.

The trial court noted at oral argument on the motion to suppress that the identification by the four witnesses Simmons challenged involved individuals who were personally familiar with him.  Each positively identified him when they initially spoke to police, albeit by a nickname as opposed to his legal name.[4]   The

---

[4] Several witnesses alternately identified one of the shooters as Green Eyes, J, or Jay. Each of those witnesses later confirmed, after viewing Simmons' DOL photo, that the person that they knew by the nickname they provided was Simmons.

One witness knew Simmons' legal name and directly identified him as one of the shooters.

procedure complained of by Simmons was only provided to connect the street and government names of the person each witness otherwise identified as one of the shooters. As such, the use of Simmons' Department of Licensing photo toward that end was not an impermissibly suggestive procedure that would have skewed the identifications. Each witness asserted that they knew what Green Eyes/J/Jay looked like—they just didn't know his true legal name.

Our opinion in State v. Collins is informative here. 152 Wn. App. 429, 216 P.3d 463 (2009). In Collins, we clarified:

> There is a wide difference between identification of a stranger seen only under the stress of a crime in progress and identification of a known individual in a photograph. There is no likelihood that recollection will be distorted by suggestive procedures when the witness already knows the person depicted.

Id. at 435. We explained, "[t]he identification of a suspect by an acquaintance does not raise the due process concerns that arise when an eyewitness identification is tainted by suggestive procedures." Id. at 436. It is undisputed that all four identifications at issue here involve witnesses who were acquaintances of Simmons, therefore no due process concern exists and Simmons fails to carry his burden. For the same reasons, it was not error for the trial court to allow the witnesses to identify Simmons in court during their testimony.

V.     CrR 8.3(b) Motion to Dismiss due to Government Misconduct

Prior to the start of trial, Simmons argued pursuant to CrR 8.3(b) that the case against him should be dismissed due to government misconduct based on his claims as to his arrest in Mexico. He argued in the alternative that the court should suppress the cellphones that were turned over to US authorities at the

border, as well as any evidence extracted from them. Simmons claimed that he was illegally arrested in his home by Mexican authorities and he inferred that this was directed by US authorities who were seeking him in connection to this incident. He was turned over to a deputy US Marshal at the US/Mexico border, transferred to the San Diego Central Jail, and eventually extradited to Washington based on a warrant filed with the information in this case. The trial court denied the motion and found that Simmons failed to meet his legal and factual burden. The court ruled that Simmons did not establish facts demonstrating any illegal search or seizure occurred as there was no evidence provided as to his arrest by Mexican authorities apart from Simmons' own assertions. The same is true on appeal, particularly in light of the fact that our review is limited to the record from the trial court. See State v. MacFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

On the record before us, we do not find the trial court erred in denying the motion to dismiss. Aside from the inadequacy of the evidence in support of Simmons' claims, we reiterate the Washington State Supreme Court's clear holding in State v. Bowman: "'Where, for any reason, an arrest is invalid, but the defendant enters a plea of not guilty and is in court on the day of trial, the court has jurisdiction of his person.'" 69 Wn.2d 700, 703, 419 P.2d 786 (1966) (quoting State v. Ryan, 48 Wn.2d 304, 305, 293 P.2d 399 (1956)). The authority Simmons provides for this assignment of error focuses on tribal sovereignty, a uniquely distinguishable concern from government misconduct, and does not engage with this longstanding state authority.

We agree with the trial court's ruling that Simmons had not met his burden and further determination that, "it would be [an] extraordinary [remedy for a] court to dismiss under 8.3(b) because somebody flees to Mexico and is then arrested in Mexico." The trial court noted "there is no evidence before this court as to arbitrary Governmental action that somehow would violate the Fourth Amendment here in his arrest." For this same reason, we need not consider Simmons' argument for suppression given that he has not established that Washington authorities should be held responsible for the alleged misconduct of a foreign government. Even if we found there was a sufficient record to reach that issue, suppression is not an available remedy under CrR 8.3(b).

VI.     Sufficiency of the Search Warrants for Simmons' Cell Phones

Simmons next challenges the sufficiency of search warrants issued as to his cell phones. First, he argues that the warrant issued for a search of his cell phone lacked sufficient particularity regarding the information sought. The record reveals that Simmons is conflating two separate warrants authorizing two distinct searches. The first was for service provider records for a cell phone number from a specific two-day period, which Simmons argued lacked the requisite particularity as the warrant allowed for retrieval of cloud data generally. However, no cloud data was recovered under authority of that warrant. As such, we decline to review this challenge.

The second warrant was for the search of the three phones transported with Simmons as associated with him at the time of arrest. Here, the State conceded the first warrant to search the three phones was flawed and invalid. The remedy

for the error, which Simmons agreed was proper, was for the State to seek a second warrant. The State sought a second warrant under the independent source doctrine and executed a second search of the phones pursuant to the corrected warrant. See State v. Gaines, 154 Wn.2d 711, 718, 116 P.3d 993 (2005). Given that Simmons conceded at the trial court that the second warrant remedied the deficiencies in the original, his argument on appeal as to this issue is waived.

VII.    Prosecutorial Misconduct

Simmons next avers that the prosecutor committed misconduct in closing argument based on three separate incidents. "The right to a fair trial is a fundamental liberty secured by the Sixth and Fourteenth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703, 286 P.3d 673 (2012). When a prosecutor commits misconduct, it may deprive a defendant of their constitutional right to a fair trial. Id. at 703–04. Prosecutors play a central and influential role in ensuring the fundamental fairness of the criminal justice system. State v. Monday, 171 Wn.2d 667, 676, 257 P.3d 551 (2011).

To prevail on his claims of prosecutorial misconduct, Simmons must show that, within the context of the record and circumstances of the trial as whole, the prosecutor's conduct was both improper and prejudicial. State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). "To show prejudice requires that the defendant show a substantial likelihood that the misconduct affected the jury verdict." Glassmann, 175 Wn.2d at 704. Because Simmons failed to object at trial, "the errors he complains of are waived unless he establishes that the

misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice." Id. As an initial matter, we look to each claim independently to determine whether the challenged statement constitutes misconduct.

### A. Improper Burden-Shifting

Simmons first claims that the prosecutor "improperly shifted the burden to the defense in its rebuttal argument." In particular Simmons complains of the State's characterization that the jury must "buy off" on the defense case, find that numerous witnesses were not credible, and accept that the telephonic evidence was an "unfortunate coincidence." Again, "[w]e review allegedly improper statements by the State in the context of the argument as a whole, the issues involved in the case, the evidence referenced in the statement, and the trial court's jury instructions." State v. Fuller, 169 Wn. App. 797, 812, 282 P.3d 126 (2012). Even if we were to assume that this argument amounted to misconduct, we cannot say that it was not curable by the instructions directing the jury that "[t]he defendant has no burden of proving that a reasonable doubt exists as to these elements" and detailing the presumption of innocence. Further, the statements complained of as burden-shifting were responsive to the closing argument of the defense. This case hinged on credibility determinations as to the various witnesses, with no affirmative defense at play. This left closing arguments from both sides to center on a review of credibility as to the various witnesses and allowed the parties to urge the jurors to believe certain witnesses over others as to their account of the events on the evening in question.

B.    Vouching for State's Witnesses

Simmons next argues that the prosecutor improperly utilized the phrase "we know" throughout his closing such that it amounted to improper vouching for certain witnesses.  It is improper for a prosecutor to personally vouch for the credibility of witnesses.  State v. Brett, 126 Wn.2d 136, 175, 892 P.3d 29 (1995).  Simmons notes in briefing that the prosecutor utilized "the phrase 'we know' about 22 times," but fails to provide context for any of those quotes.  When we look to the transcript of closing argument, the prosecutor's use of "we know" was in the context of walking the jury through the various pieces of evidence presented at trial and suggesting the inferences they should draw from that evidence as finders of fact.  Even if we were to assume this was misconduct, we cannot conclude that it was so flagrant and ill-intentioned that instruction would not cure it.  The jury was provided instruction 22 which expressly stated, "You are the sole judges of the credibility of each witness."  We presume that juries follow the instructions of the court.  State v. Moe, 56 Wn.2d 111, 115, 351 P.2d 120 (1960).  In light of this presumption, Simmons has not carried his burden as to this challenge.

C.    Appeal to Emotion

Simmons next draws our attention to the prosecutor's argument in the following passage:

> That's because the law is rooted in our shared common intellectual sense, in our shared common moral sense. What that means is that if we apply the law to the evidence and we follow the law, then you'll reach the correct verdict. And by doing that, by following the law, by applying the facts to the law, it will feel right, it will feel right intellectually, it will feel right morally, and it will feel right, just feel

> right. Because it makes sense, the law makes sense. It makes sense here, and it makes sense here, and it makes sense deep in here.

As to our preliminary determination of whether such argument constitutes misconduct, we need look no further than an opinion of this court published not even a year ago, wherein this same deputy prosecutor made this same argument—apparently a classic closing for him. See State v. Craven, 15 Wn. App. 2d 380, 475 P.3d 1038 (2020). We reinforce the analysis and conclusion therein,

> As a judicial officer, the prosecutor should have understood that following and applying the law will not always feel right emotionally or instinctually. In fact, as the court instructed, jurors are court officers with an obligation to set aside their biases and intellectually apply the law to the facts even if the result is personally distasteful or disappointing.

Id. at 388-89.

Even in Craven, where defense objected, we concluded that the curative instruction given by the court was sufficient to resolve the prejudice created by the misconduct. Id. at 386, 391. In light of that determination, we cannot now say that Simmons has carried his burden in establishing the prejudice flowing from the prosecutor's nearly identical statements in this trial were such that the misconduct was so flagrant and ill-intentioned that an instruction would not have been sufficient to cure. We however, do think it wise that the prosecutor stop talking feelings and focus on law and evidence in closing argument.

VIII. Life Sentence Under the Persistent Offender Accountability Act

In his final assignment of error, Simmons asserts the mandatory life sentence without the possibility of parole that was imposed pursuant to the POAA is unconstitutional given that one of his predicate offenses was committed while

he was a juvenile. Simmons was 16 years old at the time of the offense, but was convicted as an adult and the crime is scored as an adult felony under the Sentencing Reform Act of 1981 (SRA). RCW 9.94A.030(34). Nearly identical challenges were addressed in our state Supreme Court's recent opinion, State v. Moretti which held that the POAA did not violate article I, section 14 of our constitution when an offender's sentence is based on prior convictions for most serious, or "strike," offenses which were committed as young adults. 193 Wn.2d 809, 834, 446 P.3d 609 (2019). We recognize the factual distinction, though, given that Simmons was a juvenile, unlike the "youthful offenders" in Moretti.[5][6] However, several recent cases from the other divisions of this court have followed Moretti with regard to defendants with predicate offenses committed before they reached the age of majority. See State v. Teas, 10 Wn. App. 2d 111, 131–35, 447 P.3d 606 (2019), review denied, 195 Wn.2d 1008 (2020); see also State v. Vasquez, No. 36281-7-III, slip op. at 11–14 (Wash Ct. App. Dec. 10, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/362817_unp.pdf; State v. Smith, No. 36213-2-III, slip op. at 20–22 (Wash Ct. App. Apr. 6 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/362132_ord.pdf. In light of this precedent, we are bound to similarly follow the reasoning set out in Moretti.

---

[5] In footnote 5 of Moretti, the Court expressly stated "[w]e express no opinion on whether it is constitutional to apply the POAA to an offender who committed a strike offense as a juvenile and was convicted in adult court."

[6] A juvenile is someone who has not reached the age of majority. RCW 26.28.010. "Youthful offenders" are those who have, but who may not yet have reached full brain maturity according to developing science. Case law continues to refine the age range that encompasses youthful offenders. See In re Pers. Restraint of Monschke, 197 Wn.2d 305, 482 P.3d 276 (2021); State v. O'Dell, 183 Wn.2d 680, 358 P.3d 359 (2015).

A. POAA overview

Under the POAA, "persistent offenders" must be sentenced to life in prison without the possibility of parole. RCW 9.94A.570. A "persistent offender" is an individual who commits a third most serious offense after having been convicted on two separate prior occasions of most serious offenses or their out-of-state equivalents. RCW 9.94A.030(38). A "most serious offense" is any class A felony or certain class B felonies that are violent, sexual, or dangerous. See RCW 9.94A.030(33). Juvenile offenses are not included as strikes under the POAA. State v. Thorne, 129 Wn.2d 736, 748, 921 P.2d 514 (1996) (abrogated on other grounds by Black v. Ctr. Puget Sound Reg'l Transit Auth., 195 Wn.2d 198, 457 P.3d 453 (2020)); RCW 9.94A.030(34).

B. Mootness

As a preliminary matter, the State asserts that this issue is moot given that Simmons' offender score is so high that standard range sentences, with the statutory requirements as to the firearm enhancements and consecutive time, would function as a life sentence.

Generally, this court does not consider matters which are moot. State v. Gentry, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995). "A case is technically moot if the court can no longer provide effective relief." State v. Hunley, 175 Wn.2d 901, 907, 287 P.3d 584 (2012). However, this court may consider an issue if it determines that it presents "matters of continuing and substantial public interest." Id. This determination is made by weighing the following factors: "'[(1)] the public or private nature of the question presented, [(2)] the desirability of an authoritative

determination for the future guidance of public officers, and [(3)] the likelihood of future recurrence of the question.'" Id. (alterations in original) (quoting In re Pers. Restraint of Mattson, 166 Wn.2d 730, 736, 214 P.3d 141 (2009)). Claims involving interpretation of the SRA have been found to be "matters of continuing and substantial public interest." See Hunley, 175 Wn.2d at 907; see also Mattson, 166 Wn.2d at 736. The key distinguishing fact between Simmons' case and those addressed in Moretti, however, is that one of Simmons' strikes was committed when he was a juvenile as opposed to those committed as "youthful offenders" by the defendants in Moretti. That single distinguishing fact is significant enough to weigh in favor of taking the issue up.

### C. Categorical Bar Analysis

Simmons first argues that his sentence is categorically barred under article I, section 14 of our state constitution. It has already been recognized that article I, section 14 is "more [protective] than the federal constitution in the context of sentencing both recidivists and juveniles," so we need only look to our state constitution. Moretti, 193 Wn.2d at 834. "The first step in the categorical bar analysis is to determine whether there is a national consensus against" counting adult convictions for crimes committed while one was a juvenile toward a life sentence under a habitual offender law by looking at "'objective indicia of society's standards, as expressed in legislative enactments and state practice.'" State v. Bassett, 192 Wn.2d 67, 85, 428 P.3d 343 (2018) (internal citation omitted) (quoting Graham v. Florida, 560 U.S. 48, 61, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010)). The burden is on the party bringing the challenge to establish that a national

consensus exists. Moretti, 193 Wn.2d at 821. The second step is for this court to exercise its independent judgment. Bassett, 192 Wn.2d at 87. This is accomplished by considering "'the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question'" and "'whether the challenged sentencing practice serves legitimate penological goals.'" Id. (quoting Graham, 560 U.S. at 67).

As to the first step in the categorical bar analysis, whether a national consensus exists regarding the specific sentencing practice, Simmons has not met his burden. Simmons argues there is an "emerging national consensus that juvenile offenses should not count as strikes." However in arguing such, Simmons focuses on juvenile convictions via juvenile adjudications as opposed to convictions in adult court for crimes that were committed by a juvenile.[7] There are numerous ways in which a juvenile conviction in our state, and likely others, is distinct from an adult conviction where the crime was committed as a juvenile. See Juvenile Justice Act of 1977, ch.13.40 RCW.

As recently as 2019, in Moretti our Supreme Court expressly found there was no national consensus against using a crime committed as a young adult to enhance the sentence of an adult who continues to offend. 193 Wn.2d at 821. Specifically, the opinion provided, "[a] review of the case law shows that many state courts have held that when sentencing an adult recidivist, it is not cruel and unusual to consider strike offenses committed when the offender was not just a young adult, but a juvenile." Id. at 822. Further, all of the secondary authority

---

[7] In Washington, jurisdiction over a juvenile defendant may be transferred to superior court if the juvenile court declines to retain it. See RCW 13.04.030; 13.40.110

provided by Simmons in the case before us existed at the time of the Supreme Court's review in Moretti. Simmons has not met this burden to establish a national consensus against the sentencing practice he challenges.

The second step is for this court to utilize its independent judgment by considering "'the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question'" and determine "'whether the challenged sentencing practice serves legitimate penological goals.'" Bassett, 192 Wn.2d at 87 (quoting Graham, 560 U.S. at 67). Here, Simmons correctly identifies the severity of the sentence as the harshest available in our state. See State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018). As to Simmons' culpability in light of the crimes he committed, double murder and assault in the first degree all with firearm enhancements, we see no reason to depart from the reasoning set out in Moretti. Moretti made clear that the focus in POAA analysis is not on the prior strikes where the commission of those crimes may have been impacted by incomplete brain development and other mitigating factors of youth, but on the third most serious offense that triggered the applicability of the POAA after the defendant continued to offend into adulthood. Id. at 825–26.

Simmons falters by framing the punishment before this court as one for the conviction he received when he was a juvenile and not based on the multiple most serious offenses giving rise to this case. As such, Simmons has not shown reduced culpability as to the present offenses which he committed at the age of 35. "Many of the cases exempting juveniles from harsh sentencing practices have

relied on the strong prospects of juveniles for change." Id. at 824. Here, those cases do not apply to someone who continued to offend well into adulthood. See Id. at 826. Further, Simmons' convictions here are of a more severe nature than those before the Moretti court. Id. at 813–18 (reviewing consolidated challenges to POAA by multiple petitioners—Moretti was convicted of robbery in the first degree and assault in the second degree; Nguyen was convicted of first and second degree assault, both with a deadly weapon enhancement; Orr was convicted of burglary in the first degree and assault in the second degree, both with a deadly weapon enhancement).

The final question of "whether the penological goals of retribution, deterrence, incapacitation, and rehabilitation are served by this sentence" is also resolved in a manner similar to Moretti. Bassett, 192 Wn.2d at 88. "A sentence of life without the possibility of parole will never serve the goal of rehabilitation." Moretti, 193 Wn.2d 826–27. "The main purposes of the POAA are 'deterrence of criminals who commit three most serious offenses and the segregation of those criminals from the rest of society.'" Id. at 827 (internal citation omitted) (quoting State v. Witherspoon, 180 Wn.2d 875, 888, 329 P.3d 888 (2014)).

Simmons' argument regarding the penological goals misses the mark as well because he focuses on youthfulness, as opposed to his decision-making in adulthood that led to the most recent strike offenses. He claims that no deterrent effect exists by including strikes which were committed as a juvenile because "[t]he same characteristics that render juveniles less culpable also makes them less likely to consider potential punishment." However, Simmons did not commit these

murders and assault as a youth, but instead as an adult, which renders this particular argument inapplicable to the present case. Here, like in Moretti, "[w]e do not have to guess whether [Simmons] will continue committing crimes into adulthood because [he] already ha[s]." Id. at 829. The penological goals intended by the legislature are served by including adult convictions for strike offenses committed as a juvenile.

Simmons is unsuccessful in establishing that the Washington State Constitution categorically bars his sentence of life without the possibility of parole when predicated on an adult strike offense committed as a juvenile. Simmons' argument as to an "emerging" national consensus is not sufficient to carry his burden, particularly in light of our Supreme Court's finding to the contrary in Moretti. Neither does he prevail on his arguments as to his culpability and whether POAA serves legitimate penological goals. We further acknowledge that Division II of this court recently reinforced this particular analysis in Teas, which involved an offender who had committed their predicate strike offense between the age of 17 and 19.[8] 10 Wn. App. 2d at 120, 131–35.

### D. Proportionality Review

A second prong to Simmons' constitutional challenge to his sentence is his assertion that it violates article I, section 14 of our state constitution because it is grossly disproportionate to the offenses for which he was convicted. Moretti, 193 Wn.2d at 830. "When conducting a proportionality analysis, we consider '(1) the nature of the offense, (2) the legislative purpose behind the statute, (3) the

---

[8] Teas' precise age at the time of this offense is unclear from the opinion.

punishment the defendant would have received in other jurisdictions, and (4) the punishment meted out for other offenses in the same jurisdiction.'" Id. (internal citation omitted) (quoting Witherspoon, 180 Wn.2d at 887). In Moretti, the Supreme Court found the life sentences imposed on the three petitioners were not grossly disproportionate. Id.

As to the first factor, the nature of the offense, Simmons was convicted of three most serious offenses at trial, all of which are class A felonies- two counts of murder in the first degree and one count of assault in the first degree, and the jury found by special verdict that a deadly weapon enhancement applied to each count. As a practical matter, the statutory maximum sentence for each murder charge and the assault in the first degree is life in prison. Given Simmons' offender score, and the mandatory consecutive and enhancement time, the State calculates his standard range as 1104–1351 months, or 92 to 112 years in prison. Further, the convictions here are of a more serious nature than those reviewed and upheld by the Supreme Court in Moretti. Id. at 830–31. The first factor does not weigh in Simmons' favor.

Second, as to the legislative purpose of the statute, "the purpose of the POAA is to deter criminals who commit three most serious offenses and to incapacitate them by segregating them from the rest of society." Id. at 832. Just like the petitioners in Moretti, Simmons has "shown that [he is] unwilling to stop endangering the public." Id. at 832–33. Therefore, this factor tends to indicate that Simmons' sentence is not grossly disproportionate.

The third factor, the punishment that the offenders would have received in other jurisdictions, does not weigh in Simmons' favor, since multiple counts of murder could result in a death sentence in numerous jurisdictions. See FLA. STAT. ANN. § 782.04; TEX. PEN. CODE ANN. § 12.31; ARIZ. REV. STAT. ANN. § 13-1105. Further, the Supreme Court has recognized that "[a] total of 34 states appear to have some sort of habitual offender statute, many of which allow or require imposing life sentences." Moretti, 193 Wn.2d at 833. But even outside of the framework of a habitual offender statute, the crimes for which Simmons was convicted alone would result in a significant sentence in any jurisdiction.

The final factor is the punishment the offender would have received for a different crime in the same jurisdiction. In Moretti, the court framed this by looking to what the petitioners would have received if they had committed any other most serious offense—which would be identical to that of life without the possibility of parole. Id. at 833–34. The same is true here. Simmons' proportionality challenge fails.

E.     Racial Disproportionality

Simmons' final challenge to the constitutionality of his sentence is his claim that the POAA results in disparate racial impact and violates article I, section 14 of the Washington State Constitution. The record before us is lacking in both sufficient data and argument for us to engage in a full review of this assignment of error. Though Simmons argues his challenge mirrors that of Gregory, there the court was presented with more robust and conclusive data which allowed the Supreme Court to be "confident that the association between race and the death

penalty is not attributed to random choice." 192 Wn.2d at 22 (emphasis omitted). We certainly acknowledge the systemic racism which permeates our criminal legal system. We find compelling the defense assertion at oral argument that the numerous discretionary decisions of prosecutors accumulate along one's trajectory through the system, including and especially the discretionary decision of a prosecutor to decline a particular juvenile offender into superior court and proceed against others in juvenile court. However, in order to fully engage in the racial disproportionality analysis of the POAA that Simmons seeks, we simply must ground that review in comprehensive data. We echo the conclusion reached by another panel of this court where we clarified that this sort of challenge requires thorough studies and specific data on the matter of disproportionality, and, in the absence of such a record, we decline to reach this issue. See State v. Kennon, No. 80813-3-I, slip op. at 25–28 (Wash. Ct. App. Aug. 16, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/808133.pdf. Simmons has failed to demonstrate that his sentence of life in prison without the possibility of parole is unconstitutional.

Affirmed.

WE CONCUR:

Mann, C.J.

- 29 -